UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:09-CR-75-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>JASON CHRISTOPHER COLLINS, )<br>)<br>Defendant. ) | **MEMORANDUM AND<br>RECOMMENDATION** |

This case comes before the court on the motion by defendant Jason Christopher Collins ("defendant") (D.E. 30) to suppress the firearm and ammunition found during a search of his home in October 2008 pursuant to a state search warrant and statements he made incident to the search as violative of his rights under the Fourth Amendment to the United States Constitution. Defendant did not file a supporting memorandum, but included his supporting argument in the motion.[1] The government filed a response (D.E. 33) in opposition to the motion. The motion was referred to the undersigned Magistrate Judge for issuance of a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On 17 September 2009, the undersigned held a hearing on the motion. For the reasons stated below, defendant's motion should be denied.

## I. PROCEDURAL BACKGROUND

On 18 June 2009, an indictment (D.E. 1) was issued against defendant charging him with possession of a firearm (*i.e.*, a 12-gauge shotgun) and ammunition by a convicted felon on or about 13 October 2008 ("13 October") in violation of 18 U.S.C. §§ 922(g)(1) and 924. Defendant filed his motion to suppress on 12 August 2009. On 17 September 2009, the government filed a

---

[1] Defendant should have filed a separate supporting memorandum, as required by Local Criminal Rule 47.1(b), E.D.N.C. In its discretion, the court in this instance will consider defendant's motion on its merits notwithstanding this deficiency.

superseding indictment (D.E. 51) changing the date of the alleged offense to on or about 30 October 2008 ("30 October").

At the suppression hearing, the government presented the testimony of Kenneth Becker ("Becker"), a detective who has served with the Wilmington Police Department vice and narcotics unit for ten and a half years and is the agent in charge of the investigation of defendant (Transcript of Hearing ("Tr.") (D.E. 53) 4:1-9). Defendant presented no witnesses. While neither party offered any exhibits at the hearing, defendant did include with his motion a copy of the subject search warrant (D.E. 30, p. 5)[2] and the affidavit submitted by Becker ("Becker Affidavit") (D.E. 30, pp. 5-10) to obtain the warrant. In the absence of any challenge to the authenticity of this copy of the search warrant, the court has considered it for the purposes of this Memorandum and Recommendation. The court held the record open for a week after the hearing for supplemental briefing by the parties (*see* D.E. 50), but neither party has filed any further memoranda.

## II. FACTUAL BACKGROUND

The material facts are not in dispute. In the early morning hours of 13 October, officers of the Wilmington Police Department were dispatched to defendant's residence at 911 Bonham Avenue in response to a call from his neighbor at 914 Bonham Avenue that there was a dispute between the two residences. (Tr. 4:13-22; 9:15-17; Becker Aff. ¶¶ 1, 2). During their investigation, the officers went to defendant's front door where they encountered defendant's girlfriend. (Tr. 5:3-5). The officers asked the girlfriend to wake defendant, but before she could leave the front door to do so, defendant came to the door. (*Id.* 5:7-9). Apparently believing that one of the officers had pushed his girlfriend, defendant became enraged and ordered the officers to get off of his property. (*Id.*

---

[2] Page number references in record citations are to the numbers assigned by the CM/ECF electronic docketing system.

2

Case 7:09-cr-00075-FL  Document 58  Filed 10/19/09  Page 2 of 15

5:10-15). Defendant requested that someone "go get his shotgun" and stated that "he had something for the officers." (*Id.* 5:16-17). Defendant then retrieved his cell phone from a vehicle and went back into the house. (*Id.* 5:22-24). Shortly thereafter, a call was placed to 911 by a male caller who claimed that the police were unlawfully on his property and that they needed to get off the property or he would shoot them. (*Id.* 5:24-6:3; Becker Aff. ¶ 2).

Following this threat, at approximately 2:00 a.m., an officer at the scene called Becker for assistance. (Tr. 5:24-6:5; 16:23-17:7; *see* Becker Aff. ¶ 2). In addition to describing the events that had occurred, the officer told Becker that defendant was a convicted felon. (*Id.* 17:8-11; Becker Aff. ¶ 2). Becker advised the officer that because no weapon had been seen and there were no exigent circumstances warranting retrieval of a firearm from defendant's residence, the officers should leave the scene and "let everything cool down." (Tr. 6:4-11; *see* Becker Aff. ¶¶ 2, 3). Prior to the officers leaving, defendant told them that he was a member of a gang. (Tr. 6:16-7:12; *see* Becker Aff. ¶ 8).

At approximately 8:00 a.m., Becker reviewed the officers' written reports from the incident as well as the 911 call history, which corroborated the information he had received in the telephone call during the incident. (Tr. 8:2-9). Becker also confirmed that the telephone number of the caller who had made the threat to shoot the officers was defendant's. (*Id.* 8:16-9:7). Becker then went to 914 Bonham Avenue to interview the neighbor, Shawntee Sutton ("Sutton"), who had made the initial 911 call regarding the dispute with defendant. (*Id.* 9:15-21).

In addition to discussing the events earlier that morning, Sutton told Becker that she had seen defendant in the front yard with a handgun a couple of months earlier. (*Id.* 9:19-10:5; 10:10-13; Becker Aff. ¶ 6). She further stated that defendant had pointed the gun at her and then pointed it into the air and fired. (Tr. 10:14-22; Becker Aff. ¶ 6). Sutton also stated that a few months ago she had

3

seen the barrel of a "long gun" protruding from behind a dresser in a bedroom in defendant's home. (Tr. 11:4-10; Becker Aff. ¶ 6).

While in the area, Becker wrote down the license numbers of the pick-up truck and two cars in the driveway of defendant's residence. (Becker Aff. ¶ 5). Becker determined that all were registered to defendant. (*Id.*).

After Becker returned to his office, he submitted a request for a copy of the audio recording of the 911 call in which the caller had threatened to shoot the police. (*Id.* 12:12-19; *see* Becker Aff. ¶ 9). Becker also requested a copy of defendant's criminal record from the Department of Corrections ("DOC"), referred to as the penitentiary packet or "PEN packet," to determine whether his right to possess firearms had been restored. (Tr. 12:22-13:2; 26:19-20; 37:16-25; *see* Becker Aff. ¶ 9). He wanted the PEN packet because the criminal history for defendant Becker obtained at the police station showed that his rights had been restored and the PEN packet would show whether the restoration included his right to possess firearms. (Tr. 37:16-38:15).

The next day, Becker had another detective call the telephone number from which the threatening 911 call had been placed. (Becker Aff. ¶ 7). The person who answered identified himself as "Jason," the first name of defendant. (*Id.* ¶ 2).

Approximately nine days later, around 23 October 2008, Becker received defendant's PEN packet, which confirmed that defendant's firearm rights had not been restored following a felony conviction for possession of a stolen firearm, and the 911 recording. (*Id.* 13:12-20; 38:16-39:17; Becker Aff. ¶¶ 8, 9). Becker subsequently played the 911 recording for one of the officers who had participated in a conversation with defendant on 13 October, and the officer confirmed that the caller

was defendant. (Tr. 13:3-11; Becker Aff. ¶ 10). Becker later confirmed that the vehicles he had seen at defendant's residence were still there. (Becker Aff. ¶ 11).

He then completed an affidavit and proposed warrant to search defendant's home and vehicles for firearms and ammunition, along with evidence of ownership or control of the residence. (*Id.* 14:2-3; Search Warrant; Becker Aff. ¶ 6). In his affidavit, Becker described the 13 October incident and his follow-up investigation, including many, but not all, of the facts reviewed above, and several additional facts. (*See* Becker Aff.).

On 28 October 2008 ("28 October"), 15 days after the 13 October incident, a Superior Court judge issued the warrant based on Becker's affidavit. (Tr. 14:2-7; Search Warrant). Two days later, on 30 October, Becker and about ten other officers executed the warrant. (*Id.* 14:9; 32:23-33:1). During the search, defendant told police that he had a shotgun in a closet. (*Id.* 14:17-22). Officers went to the bedroom closet and found a 12-gauge shotgun, 2 boxes of 12-gauge ammunition, a wooden crate containing a cache of various types of ammunition, a gun cleaning kit, and an empty box for a Ruger handgun. (*Id.* 14:24-16:12).

## III. DISCUSSION

### A. Overview of Defendant's Contentions

In the cursory argument presented in the combined motion and memorandum defendant filed,[3] he appeared to challenge the legality of the 30 October search of his residence on two grounds. The principal ground was that Becker's affidavit failed to establish probable cause for issuance of the warrant because much of the information in it was stale, that is, too old to furnish probable cause, because the information concerned the 13 October incident or earlier events. The secondary ground

---

[3] Excluding the prayer for relief, the argument comprises four paragraphs. (Mot. 2-3).

was that Becker's affidavit failed to establish probable cause for issuance of the warrant even if the information in it were deemed not to be stale.

At the hearing, defendant's new counsel, who did not file the motion, abandoned this secondary argument, conceding that probable cause to search defendant's residence existed on 13 October. (Tr. 42:1-14; 43:24-44:13;[4] 45:10-16). Rather, he relied solely on the principal ground advanced in the motion, arguing that the lapse of 15 days between the 13 October incident and the 28 October issuance of the warrant negated the existence of probable cause. The government contends that the information in Becker's affidavit was not stale and established the requisite probable cause. Before turning to an analysis of defendant's contentions, a review of the relevant legal principles is in order.

## B. The Fourth Amendment Standard for Search and Seizure

The validity of the search warrant for defendant's residence must be examined under federal standards even though it was a state warrant issued executed by local law enforcement officers. *United States v. Melancon*, 462 F.2d 82, 91-92 (5th Cir. 1972). The Fourth Amendment provides that people are "to be secure in their persons . . . and effects, against unreasonable searches and

---

[4] For example, defense counsel had the following colloquy with the court:

| THE COURT: | LET ME ASK YOU THIS [DEFENSE COUNSEL]. YOU BELIEVE— WHAT I HEARD YOU TO BE SAYING WAS THAT YOU BELIEVE THAT THE GUN POINTING INCIDENT THAT MS. SUTTON REPORTED— ASSUMING IT'S TRUE—BUT JUST HER STATEMENT TO THAT EFFECT, WOULD HAVE CONTRIBUTED TO ESTABLISHING PROBABLE CAUSE TO SEARCH THE DEFENDANT'S HOUSE ON THE 13TH? |
|---|---|
| [COUNSEL] | OR THE 14TH; YES, SIR. I THINK THAT IS ONE MORE KIND OF CARD ON THE DECK. JUST ME TRYING TO LOOK AT IT OBJECTIVELY, AND I KNOW I AM NOT GETTING TO THE OBJECTIVE POINT, BUT TRYING TO LOOK AT IT HISTORICALLY OVER THE CASES I HAVE BEEN INVOLVED IN, <u>IT SEEMS TO ME LIKE THEY SHOULD HAVE BEEN IN THERE WITH A SEARCH WARRANT, WHICH I THINK THEY COULD HAVE EASILY GOTTEN AND SEIZED ANYTHING THAT WAS THERE.</u> |

(Tr. 43:24-44:13) (emphasis added).

6

seizures." U.S. Const. amend. IV. "The fourth amendment bars search warrants issued on less than probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984).

The Supreme Court has defined probable cause as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit submitted in support of an application for a search warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.*, 462 U.S. at 239. The determination of probable cause is to be based on the totality of the circumstances. *See id.*, 462 U.S. at 238; *United States v. Pettiford*, No. 08-4978, 2009 WL 2196856, at *1 (4th Cir. 24 July 2009).

Time has been recognized as a crucial element of probable cause. *McCall*, 740 F.2d at 1335. "A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Id.*, 740 F.2d at 1335-36 (quoting *Sgro v. United States*, 287 U.S. 206, 210 (1932). "To determine staleness, the court must examine all relevant facts and circumstances, including 'the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.'" *United States v. Washington*, 139 Fed. Appx. 479, 482 (4th Cir. 2005) (quoting *McCall*, 740 F.2d at 1336). "The passage of time in itself is not necessarily dispositive because 'probable cause cannot be quantified by simply counting the number of days the occurrence of the facts supplied and the issuance of the affidavit.'" *Id.* (quoting *McCall*, 740 F.2d at 1336). "The information in the warrant is not stale if the evidence sought is 'intrinsically likely to remain at the location where it was originally observed.'" *Id.* (quoting *McCall*, 740 F.2d at 1337). The ultimate concern of the court when confronted with an issue of staleness is whether "the facts alleged in the warrant furnish probable cause to believe, at

the time the search was actually conducted, that evidence of criminal activity was located at the premises searched." *McCall,* 740 F.2d at 1336.

When a search and seizure violates the Fourth Amendment, the exclusionary rule provides that the evidence obtained cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *United States v. Calandra,* 414 U.S. 338, 347 (1974). The rule applies to both the direct and indirect products of an unlawful search. *Wong Sun v. United States,* 371 U.S. 471, 484 (1963). Thus, evidence subject to the exclusionary rule includes not only "physical, tangible materials obtained either during or as a direct result of an unlawful invasion," but also any verbal evidence or statements resulting from the unlawful search. *Id.,* 371 U.S. at 485.

### C. Existence of Probable Cause

Under the authorities referenced, the fundamental issue presented to the court by defendant's motion is whether the facts in the Becker affidavit established probable cause to believe, when the search warrant was issued and again when the search of defendant's residence occurred, that evidence of criminal activity in the form of one or more firearms and ammunition would be located at the residence. The court finds that they did establish the requisite probable cause.

The affidavit unquestionably establishes the basic fact that the presence of a firearm and ammunition in defendant's residence would be evidence of a crime—namely, possession or ownership of such items by a convicted felon. The affidavit recites that defendant's criminal history, as set out in Wilmington Police Department and National Crime Information Center ("NCIC") records, shows his conviction for possession of a firearm. (Becker Aff. ¶ 8). The affidavit goes on to state that the PEN Packet Becker obtained contained a restoration of rights letter dated 19 July

8

2002 indicating that his right to own or possess firearms, which had been forfeited due to the conviction, had not been restored. (*Id.* ¶ 9).

The affidavit also strongly supports an inference that defendant possessed a firearm, along with ammunition for it, on 13 October. The principal evidence on this point is the 911 call in which the caller told the dispatcher that "'if the police didn't leave the property he would shoot them!'" (*Id.* ¶¶ 2; *see also id.* ¶ 9).[5] Evidence in the affidavit shows defendant to have been the caller, specifically, the identification of the voice of the caller as defendant's by an officer who participated in a conversation with defendant at the scene of the 13 October incident and the self-identification of a person at the caller's number as "Jason" when called by a detective the day after the 13 October incident. (*Id.* ¶¶ 7, 10). The threat to use a firearm has been cited as relevant evidence in supporting probable cause to conduct a search for a firearm even where a firearm was not displayed at the time of the threat. *See United States v. Templeton*, 543 F.3d 378, 379 (7th Cir. 2008) (holding that officers had sufficient probable cause to search a bank robbery suspect's car for weapons, in part, because of his threat to shoot the bank teller even though no weapon had been displayed and noting that "[m]aybe [defendant] was lying about having a gun, but the police were entitled to find out"); *see also United States v. William*, 203 Fed. Appx. 410, 413 (3rd Cir. 2006) (holding that police had probable cause to search defendant's car for firearm based on defendant's threat to shoot up a store and someone's grandmother after defendant's arrival at the location where defendant had promised to carry out the threat).

---

[5] Notably, the affidavit did not mention defendant's request that someone "go get his shotgun" and statement that "he had something for the officers." (Tr. 5:16-17).

9

Moreover, when the dispatcher receiving the 911 call asked the caller whether he had a firearm, the caller hanged up. (Becker Aff. ¶ 9). Such a response is consistent with an attempt to conceal possession of a firearm.[6]

The fact that the officers withdrew from the area of defendant's residence on 13 October is not evidence that he did not possess a firearm at that time. As Becker testified, the basis for his advice to the officers to leave was that there were no exigent circumstances that warranted a search of the residence for a firearm at that time and that a cooling-off period was warranted. (Tr. 6:4-11; 7: 13-17; *see* Becker Aff. ¶¶ 2, 3). Moreover, he believed that additional investigation was warranted. (Tr. 7:18-23; *see* Becker Aff. ¶ 3). The lead officer on the scene and another detective who had been called about the incident agreed with this approach. (Becker Aff. ¶ 3).

This evidence of the events on 13 October is supplemented by evidence of defendant's prior possession of firearms. The affidavit shows three instances of possession of firearms by defendant prior to 13 October. The earliest is the possession of a stolen firearm that was the subject of defendant's 2001 conviction. (Becker Aff. ¶ 8). The remaining prior instances are those discussed by Sutton in her statement to Becker: the one "a few months ago" when Sutton had seen a rifle in defendant's residence and the other just two months before when defendant had pointed a handgun at Sutton and fired it in the air. (*Id.* ¶ 6). The affidavit notes that Sutton was the person who initially called 911 about the 13 October incident and that "she seemed genuinely concerned for her safety"

---

[6] Although in his affidavit and testimony Becker identified defendant as a gang member (Becker Aff. ¶ 2; Tr. 6:16-7:12), the government did not present any evidence or authorities linking gang membership to gun possession. The court has therefore given defendant's gang membership no weight in its evaluation of the existence of probable cause. *See United States v. Acosta*, 110 F. Supp. 2d 918, 930 (E.D. Wis. 2000) (holding that the "bare assertion" in a search warrant affidavit that defendant was a member of a gang whose members often used firearms and stored them in their residences based on the unverified statements of unnamed informants was insufficient to provide probable cause to search the defendant's home for firearms or evidence of violent crimes).

10

vis a vis defendant when speaking with Becker. (*Id.*). These considerations can reasonably be interpreted to lend credence to Sutton's statements.[7]

This evidence of prior possession supports an inference of more recent possession. Specifically, the multiplicity of the prior instances, the familiarity of defendant with firearms suggested by his involvement with two different types of guns, the significant span of years over which the instances occurred, and the recency of the last two prior instances—especially when considered with the events of 13 October—all suggest a pattern of gun possession by defendant that was ongoing and would continue in the future. *See United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (finding probable cause to search defendant's home for firearms on rationale that evidence that defendant illegally possessed firearms "from May 1990 through March of 1993 make[s] it all the more likely that he continued to possess them another four months through July 1993 when the warrant was issued and executed"); *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995) (holding that there was probable cause to support a belief of defendant's continued, unlawful possession of firearms in light of evidence that defendant had admitted to police in an earlier investigation that he had possessed firearms combined with an informant's tip that firearms were in defendant's home six weeks prior to the search). On the basis of this evidence, it was the expectation of Becker, as a veteran officer, that any firearm defendant had at his residence on 13 October would still be there at the time of the search. (Tr. 31:20-32:6; 32:20-22). Thus, the evidence of defendant's possession of firearms prior to the 13 October incident cannot be dismissed as stale as defendant, at least at one point, advocated.

---

[7] Becker testified that he confirmed that Sutton had no felony convictions, although possibly a few misdemeanor convictions, before using any of the information from her in his affidavit, but he did not discuss her record in his affidavit and the court has not considered it in determining probable cause. (*See* Tr. 23:4-15).

11

Becker's affidavit contains evidence that, on the date the search warrant was issued, 28 October, defendant continued to live at the same residence where he lived on 13 October. This evidence includes Becker's seeing at the residence the same three vehicles registered to defendant that were present there on 13 October. (Becker Aff. ¶ 11). One of the vehicles was partially pulled into the garage. (*Id.*). In addition, the address given for defendant on a report of his arrest on 20 October 2008 for an outstanding assault charge was for the same residence. (*Id.*).

The court concludes that this body of facts as set out in Becker's affidavit—defendant's prior conviction, the events of 13 October, defendant's prior firearm possession, and his maintenance of the same residence—establishes probable cause to believe that when the search warrant was issued on 28 October and executed on 30 October evidence of criminal activity in the form of one or more firearms and ammunition would be located at defendant's residence. The search warrant therefore did not violate the Fourth Amendment.

In reaching this conclusion, the court rejects defendant's contention that the passage of 15 days after the 13 October incident negated the existence of probable cause as of the 28 October issuance of the search warrant or thereafter. Defendant bases this contention on the grounds that defendant could easily have disposed of any firearm he had during this period.

The court questions whether a firearm can be disposed of as readily as defendant posits, particularly by a convicted felon, at least if the person with the firearm seeks something of value in exchange for it. An exchange for consideration would appear more likely than disposal through the trash or comparable means given the monetary value a firearm generally has. Becker himself testified that "the evidence of a firearm isn't that readily disposable." (Tr. 30:21-22; 31:7-9).

12

In any event, as the government points out, defendant had little reason to believe that disposal of any firearms or ammunition he had was necessary to avoid police action against him. He had stored a rifle in his home in a location where it was visible to others and had brandished a handgun at his neighbor and then fired it, all with no criminal action against him. Similarly, following his threat to police on 13 October, the police stood down and left the scene without attempting to search defendant's residence. Indeed, Becker testified that he believed the police would achieve the element of surprise by refraining from acting that morning to obtain any firearms he had. (*Id.* 29:8-19).

Under the case law, a period of about 15 days between the last known or suspected instance of firearm possession, and issuance or execution of a search warrant for firearms is not treated as particularly long for purposes of the timeliness of probable cause. Much longer periods have been found not to nullify probable cause. *See, e.g., United States v. Crowffey*, 182 Fed. Appx. 249, 250 (4th Cir. 2006) (holding that defendant's extensive criminal history supported probable cause to believe he had a firearm in his home 54 days after purchasing ammunition); *Maxim*, 55 F.3d at 397 (holding that evidence that defendant was in possession of firearm four months prior to search supported probable cause to search defendant's home for firearms); *McCall*, 740 F.2d at 1337 (holding that defendant's having kept a stolen firearm for two years before showing it to a witness supported the conclusion that defendant kept it for another seven months until a search warrant was executed); *United States v. Rahn* 511 F.2d 290, 293 (10th Cir. 1975) (holding that probable cause could properly be based on comments by defendant two years prior to issuance of the warrant that the guns he had stolen might appreciate in value if kept for several years).[8] This is so even when,

---

[8] At the hearing, the government cited a lengthy list of cases that have upheld search warrants involving comparable or longer periods of time between the occurrence of the events prompting the warrant and issuance of the warrant.

13

unlike here, the delay in action by the police was unexplained. *See McCall*, 740 F.2d at 1337. As discussed, in this case, the police used the 15 days after the 13 October incident to conduct further investigation that they reasonably believed was needed to secure a search warrant, specifically, including obtaining defendant's PEN packet and a copy of the recording of the threatening 911 call.

Defendant does not argue that the two-day period between issuance of the search warrant and its execution negated probable cause. The court finds that it did not. The court notes that the delay was not arbitrary: it was needed to marshal the manpower for execution of the search warrant. (*See* Tr. 32:23-33:5).

## IV. CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon

---

However, with two exceptions, these cases involve search warrants for either drugs or stolen goods. *United States v. Blizzard*, 313 Fed. Appx. 620 (4th Cir. 2009) (drugs; eight days); *United States v. Jeanetta*, 533 F.3d 651 (8th Cir. 2008) (drugs; two weeks); *United States v. Gettel*, 474 F.3d 1081 (8th Cir. 2007) (stolen goods; six weeks); *United States v. Springer*, No. 5:09CR9, 2009 WL 1048687 (N.D. W. Va. 20 Apr. 2009) (marijuana; two weeks); *United States v. Davis*, 276 F. Supp. 2d 522 (E.D. Va. 2003) (drugs; ten days). The time periods specified in these cases are not directly applicable to the present case because they do not relate to firearms. It can be said, however, that the specified periods would tend to be shorter than permissible with firearms because of the nature of drugs as a consumable product compared to the durable nature of firearms. *See United States v. Singer*, 943 F.2d 758, 763 (7th Cir. 1991) (rejecting defendant's staleness argument with respect to a firearms search noting that "firearms, unlike drugs, are durable goods useful to their owners for long periods of time"). In accordance with this notion, when Becker was asked if he was worried about any weapons disappearing before he could finalize his investigation and obtain a warrant, he testified that "IF IT WAS DRUGS, IT WOULD BE A DIFFERENT STORY, BUT THE EVIDENCE OF A FIREARM ISN'T THAT READILY DISPOSABLE." (Tr. 30:17-22).

grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 16th day of October 2009.

James E. Gates
United States Magistrate Judge